Good morning. This particular case, there's a lot of issues, and we'd like you to address just one, and that's the meaning of collapse and policy. I think the others will fall out one way or the other, depending on where we come out. Members of the court, my name is John Petrie, and I'm from the law firm of Ryan, Swanson & Cleveland, here representing Wall & Associates. And you're correct, there are several issues in the case. I had intended to address largely the collapse issue. The briefs themselves... We've got your briefing on everything else, and so we'd ask you just to address the collapse issue, please. The briefs themselves present essentially a battle of case law to you regarding the issue of collapse. The assurance cases, however, with one exception, all address collapse cases in involving policies of insurance that contain slightly different language than the language before the court in the assurance policy issue to Wall & Associates. We are dealing with a policy here that says we do not provide coverage for collapse, but we do provide coverage for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused by hidden decay. We've submitted significant authority to the court that indicates that Washington law is clear. When you're dealing with an insurance policy and you need to determine what is the intention of the parties, what is the intention of the insured policyholder or the insurance carrier, you must start with the policy language. Two cases in particular, I think, are of significance here, Findlay v. United Pacific, and the second one is Mercer Place v. State Farm, indicate that it's also essential what you do is you consider the structure of the policy. and in particular, in this case, this policy provides coverage for... We're dealing with a first party loss here. That is, the policy provides coverage for the first party loss provides coverage for damage to the policyholder's own property, provides coverage for certain kinds of direct physical loss, or risk of direct physical loss. There are relevant three exclusions here. One is the so-called construction defect, or defective construction exclusion. One is water seepage, and the third is the decay. Now, in the State Farm case, Mercer Place v. State Farm, the court was considering circumstance where the insurance carrier was arguing that those three exclusions specifically would exclude the kind of loss at issue in that case, which was an imminent collapse case. The Court of Appeals, Washington Court of Appeals in that case, looked at it and said that what we have here is exclusions which would exclude coverage if what we had was only decay, or if we had only construction defect, or if we had only water seepage. Water seepage in this particular instance is what caused the decay. We have hidden decay, and we have in another section of the policy coverage for collapse, or I should say the risk of direct physical loss involving collapse, if it's caused by hidden decay. That section of the policy also says that even if there is construction defect that contributes to the loss, the risk of collapse, then there is still coverage for the construction, even if that construction defect contributes, provided that the actual collapse, or risk of collapse, occurs after completion of the construction. Now, assurance points to many instances in their brief about how this building was improperly constructed. When one reads the policy, however, it doesn't matter that there was improper construction or defective construction or design. It's not an exclusion in the collapse analysis, right? I'm sorry, your Honor? Improper construction is not part of the policy analysis with regard to collapse. It is in one section in the sense that it says that if that is one of the causes of the imminent collapse, then there is coverage, but only if that imminent collapse occurs during the construction. That's right, but in the facts of this case, I guess where I'm getting at, the judge looked at the policy and said, collapse, no collapse, you're out of here. So if we look at the imminent collapse or the risk involved, and we determine, number one, this didn't happen during construction, number two, there was decay, we stop there, don't we, and say, well, there's coverage. What happens after that when you bring in the rest of the evidence, I don't know, but at least you found that initially there's coverage because collapse doesn't necessarily mean it's going to fall down. That's correct. That's simple. Yes. And then we send it back. If that's the way we go, then you'd go into all the rest of the stuff about all the inspections, nothing was done, on and on and on. But the point, and that may raise other concepts of the insurance policy, but from the judge's standpoint here, he read the word collapse, no collapse, you're out. We then go to the other cases, I guess, and interpret what those policies, what those cases have said regarding the policies on collapse, when there's imminent collapse and all the theory about, well, you wait around to wait for it to fall and all that stuff. Right? That's correct. And here the district court stopped at the word collapse. That didn't collapse. Did he analyze at all, did the district court analyze at all the language relating to damage resulting from risks of loss involving collapse? I don't believe so, Your Honor. The opinion of Judge Burgess indicated that he looked at the definition of collapse and assumed that it meant the building must fall down. Right. He seemed to be applying kind of a plain language analysis to collapse and dictionary definition that's sudden. He wasn't buying extending it to imminent collapse. But I didn't see where he addressed the language that said we'll pay for loss or damage resulting from risks of loss from collapse. That's correct. He did not go through that analysis. So is that the part of the coverage that you claim you should have coverage under subject to any exclusion? Yes, Your Honor. That's correct. Did he analyze this Washington Supreme Court case, Panorama Village, in the context of the risk of collapse? He did not analyze that in the context or in his opinion, as I recall. I must apologize. That's not one thing that I looked at immediately prior to this hearing. But I don't believe there was an analysis of that case. I believe it is part of the briefs that were submitted. Although I can't tell you for certain if even the briefs themselves are part of the record. I think the rule cautions me not to make them a part of the record. But they certainly are a part of your record since you have the district court's record. As I read Judge Burgess, he recognizes what he calls the other cases that rationalize collapse. And he talks about how other cases have looked at collapse one way or the other and the imminent collapse and all that. But then he says, hey, the word collapse is not ambiguous. That's it. It's down. And he recognized the historical interpretations that the building would have to fall. This policy is a modern policy with these particular provisions. And he went through it and analyzed it. But eventually, as far as I can see, toward the end of the opinion, he just said, look, it's collapsed, it didn't collapse, and that's it. Even though he did look at the provisions of the policy, the decay provisions, whatever. Okay. Why don't we ‑‑ I think we've laid out the issue and heard from you. Why don't we hear from Assurance? I'm sorry, Your Honor. Let's hear from Assurance. Okay. May it please the Court. I'm Jerry Stahel representing Assurance. I would like, Your Honor, at some point to disregard your directions and to direct myself to the suit limitation clause, because if I'm right that the suit limitation clause applies in this case, then we shouldn't have been in the trial court and we shouldn't be here, and we actually don't even need to address the issue of collapse. So I very much do want to thank you. Why don't you go there first? I would be delighted. Thank you. But that's an issue of the district court. Did district court review that issue? Did not review that issue at all. Declared it was moot. And so it's not in the opinion of the district court at all. The policy provides that the suit must be brought within two years after the loss occurred. That's essentially the same language as was in the Panorama Village case. So we look to the Panorama Village case. Although the facts are not perfectly clear on this, for the purpose of summary judgment, I think we must assume that the suit, date of suit will be deemed to be July 31, 2001. There's an agreement that the parameters of which are not clear, but we'll assume that for purposes of summary judgment. So what we're looking for is whether the loss occurred or when the loss can be said to have no longer occurred and whether that is before July 31, 1999. Now, Panorama Village says that when you've got that language, when collapse and you're looking at collapse from hidden decay, for the purposes of the suit limitation clause, the loss no longer occurs when one of two things occurs. Either you have an actual collapse, and that's their language, actual collapse, or on the date on which the decay that poses the risk is no longer hidden, which they meant concealed from view. Let's stop there just a second. I understand what you're saying. However, isn't there a preliminary question here? Because Judge Burgess said collapse means collapse. It did not fall down. Therefore, there's no coverage. If we agree with it, it's over. Yes. If we say, wait a minute. We've reviewed the case. We've reviewed the policy. We don't think that's quite right. We have an imminent risk of collapse, et cetera. We'd have to send it back so we can address your issue. We're not going to address your issue at this point. So isn't our only inquiry as to whether we affirm because collapse means collapse or whether we expand the definition, as other cases have, to the imminent collapse, et cetera. So your issue is a sub-issue on the only thing we're going to decide here today. Are you saying we should go two steps? No. I'm saying that there are two issues here before us, essentially, either one of which is determinative. We could affirm on any ground supported by the record. That's correct. So we could affirm on an issue the district court didn't reach. Yes. But would we want to do that? In terms of the suit limitation clause, you may. And because, I mean, the collapse difficult is certainly, I think, the more difficult of the two. And the suit limitation clause is not a sub-issue. And it doesn't have to go. No determination you didn't make. No. Yes. But the question is whether or not this record contains an indication, and I think it clearly does, which is what I wanted to get to, that there wasn't hidden decay at a point before July 31, 1999. I went back and I looked at all those reports, the inaction actions, whatever. Right. And we're supposed to look at those and come up with some sort of factual determination. What is not a disputed issue of fact that we can look at to make your determination on that issue? Well, in fact, if I may, and I was going to build to this point, but if I may leap to the point to show you where I was headed, it's essentially this. The facts are undisputed about what occurred when. The only question here about whether the suit limitation applies is whether it applies at the point that they do destructive testing and determine that there's decay behind the walls or when, as they argue, it applies only when they've actually gone out to do the remediation and have pulled all the siding off. I've got a chronology. Tell me where you want to pull down the chronology to say that happened. All right. I will pull down the chronology here at the very essential point beyond which there can be no cavil, and that is there are photographs in the record, and I have them in the bench book here. They're dated, and those photographs show what the destructive testing was. What's that date? July 6, 1999. July 6, 1999. There was a destructive testing that occurred either on or before that date. Those photographs are a record of that destructive testing. There's testimony that it may have been in June or it may have been in July, but there are the photographs. Those destructive – that destructive testing and their – Is that when the wall repairs began and they scored the walls and discovered the extent of the damage to the exterior building? No. That's in December, I think. So you're saying that that's the discovery point is the destructive testing in July 99. That's the legal issue, and I want to point to why that's so. That's exactly right. We know, and the record shows, and if you turn to tab C of the bench book I have, there are the photographs there that show that they took the wall off and saw the delamination of the paper no later than July 6, 1999. They know because they did the destructive testing at that point, and they saw the hidden decay. It's no longer hidden at that point. My cryptic chronology shows that they scored the walls and discovered the extent of the damage. Now, did they do any repairs at that time? They scored the walls when they were doing the repairs. That occurred after that time. Well, but what did they do in July of 99? In July of 1999, they cut holes in certain places, and there are photographs of them under tab C. That would be scoring, would it? They would open them up. I'm sorry. I thought the score ñ here's my understanding of the word scoring was used. They went out there, they put the scaffolding up, they were going to tear it down, and they scored across like that and it fell off. That's the place I heard the word scoring. But they didn't do that until they did the repairs. Until the repair ñ the remediation. That's correct. What did they do then in July of 99? They cut a hole. They said, we're going to look behind this. That was ñ it wasn't scoring. They cut a hole and they opened it up. I wasn't calling that scoring because I ñ Either way, they cut a hole and they're going to look behind it. Correct. And they looked behind it, and what they saw was delaminated paper. What they say in their brief is what they saw was that the gypsum was mush. What you see if you look at the E.U.O. of Randy Hart, which is also under this tab 2 ñ or tab C, I mean, is it says what we were finding was that the paper face of the gypsum was delaminating from the gypsum core from water, from moisture intrusion. So this is what they saw. It's no longer concealed. It's no longer concealed in the spot where they were doing the selection test. I guess the question we have, which you can appreciate, is ñ Is that enough? One, is there a factual issue? Is there enough? There may or may not be. But since it wasn't developed in the district court, if we were to disagree with you on the policy interpretation, why should we decide this issue here? Because we don't have the district court sorting through all this. There may even be a factual issue in there. There may not be. You may be right that on its face, you know, heads up, notice. Right. But why should we deal with that now? Okay. Well, and the reason why, Your Honor, is because I thought the record was clear and there wasn't a factual dispute, and the only legal dispute was whether it was enough to cut a hole and see the hidden decay there or whether, as they argue, you must tear all the siding off and see all of the decay exposed. And for that, I was going to point you to Panorama Village because Panorama Village has the facts like this, and they ran the time from what they called the selective demolition. They ran the time from what I call intrusive testing. But, again, we're kind of into this thing where people are taught, even if we take the Panorama Village language, we would have to make a judgment that this fell within the scope of that and that you didn't need something more to land yourself into Panorama Village, wouldn't we? Well, you know, Your Honor, I don't think so. I think the record clearly shows, and everything about the record shows, although it wasn't developed below, but everything about the record shows that there was destructive testing before July 31, 1999, in which hidden decay was no longer hidden from view. Given that, I think this Court can make a determination. It wasn't ruled on by the Court below, but you can affirm on any basis and could make a determination that, in fact, the suit limitation clause began to run before that date. And that's the point I wanted to make, because I didn't think it was sufficiently delineated in the briefs either, and I wanted to make that point. Okay. I think we have your point. And obviously, if we were to disagree with you on the interpretation, we'll just have to think carefully about whether that's really the best use of an appellate court as opposed to the district court, because as presented, at least as presented to me, I'm not sure it's crystal clear one way or the other. But why don't you address the – I can hardly resist trying again, but I will move on. Yeah. Why don't you address the policy interpretation question and really answer that, you know, there was a nice analysis in the district court of the word collapse. But policy language is – I think you've helpfully provided this benchmark, which is actually very useful in a case like this. The policy language isn't just the word collapse, but involves these related phrases. So if you would address that. I will address that. And I think the first thing I'd like – and there are two points I want to make about this, I think. And the first one is I think that Judge Burgess was absolutely correct, and I think his analysis of what collapse means is so terribly clear, and his analysis of how that works in the context of the policy is terribly clear, and why collapse means actual collapse. And I do point out that Panorama Village uses the term actual collapse, which is, of course, a superfluity of language. What that shows by the very use is that if it's not collapse, then it's something else. It's virtual collapse or it's figurative collapse. But what about this language, quote, item sub two, we will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by the following blah, blah. Right. And one of them is hidden decay. So, I mean, the judge may have made a great analysis of the word collapse, but it would have been, at least to me, it would have been helpful if he had analyzed that language I just read, because he didn't. I don't think he did. No, he didn't. Don't we have to analyze it, and why isn't it dispositive? I think you're correct, Your Honor. I think it's correct that his opinion is, I think, unassailable so far as it goes, but it doesn't direct that, it doesn't address that particular language. I mean, I think we would all say the word collapse has a common English meaning, and he affirmed that point. That's correct. Well, we don't all say that, as it turns out. Some courts do treat it a little bit differently, but I don't think they should, and I think he addressed that well. Excellent so far as it goes, but his analysis is under-inclusive because he doesn't address this. So let me address that, please. This policy is what's called an all-risks policy, and it differs, therefore, from what's called a specified peril policy. As we look at the coverage language of this, then it says, we will pay for direct physical loss or damage to covered property caused by or resulting from, and then instead of sticking in specified perils, they put in the all-risks language, which is risks of direct physical loss or damage. And they do that for the purpose of making it an all-risks policy. That is a policy in which the coverage is defined essentially by the exclusions rather than the coverage agreement. Of course, what we know is you don't insure risks. You insure the loss or damage. You don't insure the risk of fire. You insure the loss or damage that's caused by that fire. But the language I read says, we will pay for damage caused by resulting from the risk. Well, in fact, it says, we will pay for physical loss caused by physical loss. It says physical loss or damage. Or risks of physical loss. I'm reading, quote, we will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building. Yes. I'm before that, Your Honor. I'm going to reach there. What I'm pointing out to you first is in the coverage grant, which is on tab A. It's at the top. Now, I conflated two provisions of the policy to get that language, but it's a verbatim conflation. And what the coverage grant is in this policy, at the very beginning of the policy, because it's an all-risk policy, what it's saying is we're going to pay for physical loss, direct physical loss or damage to covered property caused by or resulting from risks of direct physical loss or damage. So it opens up all the possibilities of the risk to be defined by the exclusion. I was stating that as an introduction to explain why the language in the exception, which is another coverage grant, in essence, because collapse is excluded. So you have to grant it back again. And the exception uses that same language, and that explains why that language is there. It does not ensure the risk of collapse any more than the policy ensures the risk of fire. It ensures the loss or damage involving collapse. And that language, unfortunately, and I have to conclude it's true, is superfluous there. It's more language than you need. But it's explained by the structure of the policy, and it doesn't really mean when you read it what Mr. Petrie says it means. It does not actually expand the coverage beyond the loss or damage of collapse. It's the risk of collapse. It's the loss of damage caused by collapse that this policy ensures. Counsel, could you tell me the date that the complaint was filed? December 6, 2001. December 6, 2001. Because going to your prior argument, I was just checking the decision of the judge in your argument about preclusion, not filed within two years. The judge says that the Wall and Associates report describing the loss was April 22, 1999. And in that report they talked about that the exterior wall was adhering to the gypsum board substrate. And it was talking about the proof of loss saying that the wall intrusion behind the EIFS and thin brick saturated the gypsum board, destroying the integrity of gypsum core. So that was, as I think, according to this and to the Wall report, it appears to be June of 1999. Is that right? That's what the judge said. Is that where you're going? This Wall and Associates? No. No, and I'm not sure exactly what you're asking, Your Honor. I'm just looking at you're saying the undisputed facts. They did make a claim for collapse in June. That's exactly right. This claim was made in June 1999. Under Panorama Village, we have to look to whether or not the decay was concealed from sight. The unfortunate thing about the Panorama Village decision, I think, is it's not a very good decision, and I think the court of appeals was right. But what it says is it must no longer be concealed from view. So even though they made the claim that the Wall report stated, according to the judge, that the loss was caused by the following. This is June 1999. Water intrusion behind EIFS and thick brick exterior cladding saturated the gypsum core wall board substrate, destroying the integrity of the gypsy core. What more do you need to say that they discovered it was no longer hidden? Your Honor, nothing. I was looking for things along your argument because when you said that, I would start thinking about what the judge had said about it. No, you're absolutely correct, Your Honor. You don't need anything more. The Panorama Village case adds this piece that says that you must see it. And so the only thing that I wanted to make clear is we have photographs in the record of the decay. Well, let me ask, clarify your position on the policy language. I guess everybody agrees there was no actual collapse here. That's one thing we all seem to, everybody seems to be on the same page on. But do you agree that there's policy coverage if there's decay that poses a risk of collapse? No, not without an actual collapse. So in that regard, why isn't Panorama controlling that a policy of this nature includes, as it said in Panorama, and they were looking at dates, a date when decay, which poses a risk of collapse, is no longer obscured from view? Why aren't we bound by the Washington Supreme Court on the language interpretation, even though it was a backhanded way of it? That issue wasn't addressed in Panorama. Let me explain. I know it wasn't addressed, but they implicitly address it here when they're addressing the date on which the loss occurred. Well, the issue in Panorama Village was, Panorama Village had a policy that's the same as this one, that the loss commences on the date that you have collapse. And in Panorama Village, there wasn't an issue about what collapse meant, by the way. That was agreed at the time it went up to the court. So that's when the loss commences. What Panorama Village considered was, when you have a suit limitation clause that says that you must bring suit within a period of time after the loss occurs, the question is not when it started, but when it ended. And so Panorama Village was looking at the question of when can you say you're after the loss occurred. Okay. Thank you. Your time is completed.  Thank you very much, Your Honor. Thank you. And thank you for the small notebook. I would add only a couple things. One of them is, if you're going to consider the suit limitation issue, Panorama Village is conclusive on that issue because it refers to when did the loss actually occur. We're dealing with the very same issue in this case. And I would also look closely at the language of the first proof of loss, Your Honor, that you mentioned, which was filed with the insurance carrier early on. And it refers to some – at that time, as I've gone through the brief, I could not find any reference to an April 1999 report. But the important issue is, by April and May of 1999, the only information that had been imparted to Wall and Associates at that point was that there were serious moisture intrusion problems. So if that's the case, and if we adopt then the interpretation of the policy, which would be imminent risk of collapse, you'd have to go back to the judge to sort through all of that stuff to find out if we're going to go to this notice issue. Correct. Excuse me. Okay. And I think Judge McKeown has also hit upon the very issue that you're dealing with here, and that is counsel wants you to take a look at this language and say how would you interpret it. Quite frankly, that's not what your cases say you ought to do. Your cases say you ought to look at this language and see how the Washington State Supreme Court or Court of Appeals would interpret this language. And it's pretty clear from Panorama Village, from Ellis Court, and from Mercer Place Condominiums that the Washington courts look at this and do include imminent collapse or substantial impairment of structural integrity as included within the language of that subsection 2 in the collapse section. Thank you very much. Thank you. And thank you both for your argument. I guess like a lot of these cases, there's more here than meets the eye, both in terms of your insurance case and also the legal analysis. Thank you. The case of Assurance v. Wallace submitted. Our next case for argument, BDK v. Escape Enterprises. Thank you.
judges: Brunetti, McKeown, Gould